# ADOPTION OF LARRY.[1]

Suffolk. March 8, 2001. - June 28, 2001.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Practice, Civil,* Findings by judge, Presumptions and burden of proof. *Evidence,* Child custody proceeding, Credibility of witness. *Parent and Child,* Care and protection of minor, Dispensing with parent's consent to adoption. *Adoption,* Care and protection, Dispensing with parent's consent.

In a proceeding on a petition initiated by the Department of Social Services to dispense with the need for parental consent to the adoption of a minor child, there was ample evidentiary support in the record for the judge's subsidiary findings that the parents accused each other of abusing the child [462-463]; that the child's mother was aware of perineal bruises on the child before an initial visit to a doctor's office [463-464]; that the mother displayed an "overall lack of credibility on and off the witness stand" [464]; that the mother made inconsistent statements about the child's head injuries [464-467]; that, assuming the father was the abuser of the child and a critical issue in the assessment of the mother's fitness would be her current and future ability to protect the child by keeping him away from the father, the mother "does not truly desire and intend to remain apart from [the] father" [467-468].

In a proceeding on a petition initiated by the Department of Social Services to dispense with the need for parental consent to the adoption of a minor child, the judge's findings that the child's mother had not made the life changes reported by a clinician during trial, and that she had not extricated herself from her dependency on the child's father, were supported by the evidence [468-469]; further, there was no error in the judge's finding, based partly on the mother's not separating from the father until four months after the child had been taken from them, that the mother did not intend to remain apart from the father [469-470].

There was no merit to the contention that a judge, who ordered that decrees issue dispensing with the need for parental consent to a minor child's adoption, did not consider the statutory factors set forth in G. L. c. 210, § 3 (*a*). [470]

In a proceeding on a petition initiated by the Department of Social Services to dispense with the need for parental consent to the adoption of a minor child, the judge did not impermissibly shift the burden of proof from the department to the child's mother. [470]

In a proceeding on a petition initiated by the Department of Social Services to dispense with the need for parental consent to the adoption of a minor

---

[1] A pseudonym.

child, the judge's finding of current parental unfitness was supported by clear and convincing evidence, and his findings demonstrated that close attention had been given the evidence. [470-472]

PETITION filed in the Boston Division of the Juvenile Court Department on December 16, 1997.

The case was heard by *Stephen M. Limon*, J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Virginia A. Peel*, Special Assistant Attorney General (*Lynne M. Murphy* with her) for Department of Social Services.

*Harold N. Robertson* for the child.

*Dawn E. LiVigne* for the mother.

SPINA, J. A judge in the Boston Juvenile Court awarded temporary custody of three and one-half month old Larry to the Department of Social Services (department) on its care and protection petition, filed in December, 1997, after the department substantiated a report filed pursuant to G. L. c. 119, § 51A, by health care providers at Children's Hospital in Boston that Larry was suffering from shaken baby syndrome and that Larry's parents were his sole caretakers at the time the abuse was inflicted. In April, 1999, the department obtained leave to amend its petition to add a prayer for termination of parental rights. G. L. c. 119, § 26. G. L. c. 210, § 3. After trial, the judge found that Larry was abused, and that the abuse was inflicted when his parents were his sole caretakers. The judge concluded that at least one parent had to be the abuser, but the evidence did not establish which parent, or if both, abused Larry. He further concluded that, if one parent did not abuse Larry, that parent nevertheless is unfit because of an inability to protect Larry from abuse. The judge awarded permanent custody of Larry to the department, and ordered that decrees issue dispensing with the need for consent of Larry's parents to his adoption.

The mother appealed to the Appeals Court,[2] which reversed the decrees of the Juvenile Court in an unpublished memorandum and order pursuant to its rule 1:28. *Adoption of Larry*, 49 Mass. App. Ct. 1121 (2000). The court held that, although the

---

[2]The father did not appeal.

judge's subsidiary findings of fact had adequate support in the record, his ultimate finding that the mother was currently unfit had not been established by clear and convincing evidence. We granted the department's application for further appellate review. The principal issues on appeal are the correctness of the judge's subsidiary findings, and the sufficiency of the evidence on the issue of unfitness. We affirm the decrees of the Juvenile Court.

1. We summarize the judge's findings and conclusions, and the supporting evidence. Larry's parents were married in June, 1994. Larry, the couple's only child, was born on August 30, 1997. On Tuesday, December 9, 1997, Larry began projectile vomiting two or three times a night when the father was taking care of him and the mother was at work. His parents brought him to his pediatrician, Dr. Lester Hartman, on Friday, December 12. The father told Dr. Hartman he was worried that there was something seriously wrong. The parents described the symptoms, and mentioned that Larry had let out a high-pitched scream on Tuesday. During the examination, the mother called Dr. Hartman's attention to two nonparallel linear bruises in the child's perineal area. The doctor would not have seen the bruises, concealed by the scrotum, unless the mother had pointed them out. The mother told Dr. Hartman that the bruises occurred when she placed Larry on a bicycle seat the previous Sunday for a photograph taken by the father. The judge found that the mother must have been aware of these bruises before going to the doctor's office. Dr. Hartman found the explanation odd and the bruises unusual, but, because the mother did not appear to be trying to conceal anything, he sent the family home with instructions to return the next day.

The family returned on December 13 and reported that Larry had vomited three times the previous evening. Dr. Hartman observed Larry for several hours after giving him formula. Larry held the liquid, so the doctor sent the family home. He telephoned the parents later that day to see how Larry was doing, and they reported that he was doing well. The father telephoned the doctor later that night to report that Larry had vomited again. The doctor told him to bring Larry to Norwood Hospital immediately, which the parents did, although the mother was upset that Larry might not be home for Christmas.

Dr. Hartman telephoned the physician on duty in the emergency room that night, to discuss the history.

Dr. Hartman saw Larry at Norwood Hospital the next morning, December 14. The nursing staff reported that Larry's nail-beds were dirty and his scalp was abnormally irritated. They noted bruises in the perineal area, bruises on the top and back of Larry's head, and a bruise on the sole of his left foot. The doctor noted, as he had on December 12, that Larry had no fever or diarrhea. Perplexed and concerned by these observations, Dr. Hartman ordered a computerized axial tomography (CAT) scan. The CAT scan revealed evidence of intra cranial bleeding. When confronted with the CAT scan results, the parents explained that the hemorrhaging might have been caused when Larry hit his head on a bassinet that past Tuesday. Larry was transported by ambulance at approximately noon that day to Children's Hospital in Boston, where he was admitted at 1:35 P.M.

Tests and examinations conducted at Children's Hospital indicated that Larry had extensive, multiple retinal and pre-retinal hemorrhages in both eyes, and bilateral subdural hematomas of different ages. Dr. Eli Newberger, director of the family development program and medical director of the child protection team in the department of pediatrics at Children's Hospital, opined from Larry's head injuries that Larry had suffered repeated episodes of trauma, and that the retinal hemorrhages could have been caused only by someone intentionally shaking the child violently for at least thirty seconds. Dr. Newberger also concluded that Larry's perineal bruises, which he observed on December 15, could not have been caused by a single placement on a bicycle seat, as the mother spontaneously informed him, but were caused by two discrete instances of blunt trauma from a linear object such as a stick. In his opinion, the bruises were no more than three days old.[3] The parents denied abusing Larry, but admitted being his only caretakers. Pursuant to G. L.

[3]The judge found, erroneously, that Dr. Newberger testified that the bruises were *more than* three days old when he saw them on December 15. Dr. Newberger testified that the bruises were *no more than* three days old. Dr. Newberger's progress notes indicate, contrary to his testimony, that the perineal bruises were *more than* three days old. The department's investigative report, filed pursuant to G. L. c. 119, § 51B, substantiating the hospital's report of

c. 119, § 51A, staff from both hospitals filed reports of suspected abuse with the department. The department filed its care and protection petition and was awarded temporary custody of Larry on December 16, 1997. After Larry's discharge from Children's Hospital on December 22, 1997, the department placed him in the home of the father's sister and her husband, where he has since resided.

Shortly after Larry was taken from them, the mother and father moved from their apartment to the home of her parents. The mother understood from her lawyer in early 1998 that she and the father would have to separate in order for her to regain custody of Larry. She had considerable difficulty accepting the idea of separation. As a teenager, her unusual height and facial hair, attributable to Stein-Leventhal Syndrome (an imbalance in male-female hormones) caused her to be extremely shy. The father is the only man she ever loved and with whom she had been intimate. She married the father when she was thirty-five years old, after dating him off and on for several years. During their marriage the mother acquiesced in the father's dominance and became highly dependent on him, but she never feared him. Their relationship was not marked by domestic violence, and she never knew him to be violent. The couple tried for nearly three years, without success, to have a child. They then tried in vitro fertilization. Larry was thus conceived, to the great joy of the mother.

When asked by a court clinician in March, 1998, how she might protect Larry from future harm the mother indicated that she and the father were discussing the subject of separation. As to why they were still together, the mother explained that she "had this dream of a white picket fence, a big house, and a

suspected abuse, indicates that hospital staff also reported, based on Dr. Newberger's assessment, that the perineal bruises were *more than* three days old. Dr. Kelly Knowles reported that the bruises were at least four days old when she saw them at Norwood Hospital on December 14, suggesting that they were visible as of Wednesday, December 10.

This situation may well have been avoided by a somewhat less rigid application of the rule concerning refreshed memory, particularly in circumstances involving expert witnesses who are not likely to remember details of the countless cases they see. When a witness asks to consult his or her notes, as here, that generally can be taken to mean that the witness's memory is exhausted, but could be refreshed by reviewing the notes.

family," and she hoped that her family could stay together. She added that, if they could stay together, she would "make sure this never happens again. . . . I'll make sure [the father] goes to counseling." She also said that the father was a loving person and she did not think that he had harmed Larry intentionally. They eventually separated, in April, 1998, but for reasons unrelated to Larry. The father moved out following an argument over money.

The mother's feelings for the father remained strong after they separated. She became upset when she saw him one day without his wedding ring. The father filed a complaint for divorce in December, 1998, but the case quickly fell into a state of dormancy, where it remained as of July 2, 1999, the last day of trial in this matter. The father admitted at trial that his intentions about getting a divorce were not clear, and they depended on the outcome of the adoption case and his pending criminal case involving Larry's injuries. He also testified that he would like to be reunited with the mother and Larry. The mother testified that the divorce case was "in limbo," that she had not made any efforts to move it along, and that she did not want to pursue a divorce while the adoption case was pending.

The department had developed a service plan with a goal of family reunification. One task under the plan called for the parents to develop an understanding of what triggers abusive behavior. The plan also required each parent to acknowledge responsibility for abusing Larry, and to explain how he was injured. The mother substantially complied with the tasks assigned to her, the sole exception being her failure to provide a satisfactory explanation for Larry's injuries. The father failed substantially to participate in the services offered by the department, and he also failed to provide a satisfactory explanation for Larry's injuries. While they were still together, the mother attributed the father's failure to avail himself of services to their mutual procrastination. A new service plan, with a goal of adoption, was developed in April, 1999, because the department could not determine which parent, or if both, had abused Larry. The father's sister and her husband were identified as the prospective adoptive family.

The judge found that Larry had been abused while his parents

were his sole caretakers and that his abuser must have been one
or both parents. He gave no significant weight to the fact that
neither parent satisfactorily explained how Larry's injuries oc-
curred because he found evidence lacking from which he could
"determine which parent (or both) caused the injuries, or
whether only one parent was present when the injuries were
inflicted, and, if so, whether the parent that was not present was
aware of how the injuries were caused." However, the judge
found the mother unfit because, if she abused Larry, her continu-
ing denial of responsibility for his injuries means that she has
serious parenting deficits. Alternatively, he found that, if the
father were the sole abuser, the mother was aware of Larry's
injuries before the office visit with Dr. Hartman but took no ac-
tion to protect him, and because she "does not truly desire and
intend to remain apart from the father," she is unable to protect
him from the father in the future due to her dependency on and
subservience to him.

2. *Subsidiary findings.* The mother challenges several of the
judge's subsidiary findings as clearly erroneous. See *Custody of
Eleanor*, 414 Mass. 795, 799 (1993). "A finding is clearly er-
roneous when there is no evidence to support it, or when,
'although there is evidence to support it, the reviewing court on
the entire evidence is left with the definite and firm conviction
that a mistake has been committed.' " *Id.*, quoting *Building
Inspector of Lancaster* v. *Sanderson*, 372 Mass. 157, 160 (1977).
We defer to a judge's assessment of the weight of the evidence
and the credibility of the witnesses. See *Petition of the Dep't of
Social Servs. to Dispense with Consent to Adoption*, 397 Mass.
659, 670 (1986). Subsidiary facts need only be proved in care
and protection proceedings by a preponderance of the evidence.
See *Care & Protection of Laura*, 414 Mass. 788, 793 (1993).

(a) The mother challenges the judge's finding that the parents
accused each other of abusing Larry, arguing that "there is not
a scintilla of evidence that [the] father accused [the] mother."
The record suggests otherwise. The father testified that he did
not injure Larry, which would leave the mother as the sole pos-
sible abuser. He also testified that he had concerns about the
mother's ability to discipline or care for Larry without hurting
him. The parents' social worker testified that the father said he

acts as a "safety factor" when he and the mother have visits with Larry because "something happened to [Larry] on three separate occasions."

(b) The mother takes issue with the judge's finding that she was aware of Larry's perineal bruises before the visit to Dr. Hartman's office. She reasons that he could not so find because he found that he could not determine whether only one parent was present when the injuries were inflicted, and, if so, "whether the parent that was not present was in any way aware of *how* the injuries were caused" (emphasis added). She contends that his findings are inconsistent. These findings are not inconsistent. One addresses the mother's awareness of the existence of the perineal bruises; the other, an awareness of what caused them.

The mother also argues that there was no evidentiary basis for the finding. Her argument rests on the fact that the judge found that Dr. Newberger testified that, as of December 15, when he first saw Larry, the bruises were *more* than three days old. The transcript indicates that Dr. Newberger testified that the bruises were *not* more than three days old. That being the case, she argues, the bruises would have first appeared on December 12, the same day she first went to see Dr. Hartman.

The judge did not conclude that the mother must have seen the bruises beforehand because he (erroneously) credited Dr. Newberger's testimony that the bruises were more than three days old as of December 15. There was other evidence from which the judge could have concluded that the bruises had become visible before December 12 and, therefore, that the mother had seen them before that date. Dr. Newberger's contemporaneous medical record indicates, contrary to his testimony, that the bruises were more than three days old when he first saw them.[4] The § 51B investigative report is to the same effect. Dr. Kelly Knowles reported that the bruises were at least four days old when she saw them at Norwood Hospital on December 14, suggesting that they were visible as early as Wednesday, December 10. Moreover, like Dr. Hartman, doctors

---

[4]Because the two versions of Dr. Newberger's opinion were in evidence, the judge was free to choose between them, or to reject both.

at Norwood Hospital failed to see the perineal bruises, concealed by the scrotum, until the parents pointed them out. The bruises were visible only if the scrotum were lifted. The judge could have inferred that the bruises were not visible to the mother at Dr. Hartman's office, but that she was able to point them out to him because she previously had seen them, as when bathing Larry or changing his diaper. There was adequate record support for the judge's finding that the mother must have seen the bruises before her visit to Dr. Hartman's office.

(c) The mother argues that there were no inconsistencies in her testimony on which the judge could have based his finding regarding her "overall lack of credibility on and off the witness stand." She urges a distinction between inconsistencies occurring during testimony, and inconsistencies between testimony and out-of-court statements. To the extent that these inconsistencies relate to the question of credibility, we do not recognize such a distinction. See P.J. Liacos, Massachusetts Evidence §§ 6.7.2, 6.7.3 (7th ed. 1999). The judge was free to consider the mother's many inconsistent statements when assessing her credibility, regardless of the source of those inconsistencies. Moreover, because all her statements were those of a party opponent of the department, they were admissible for all purposes. See *Commonwealth* v. *Morgan*, 422 Mass. 373, 379 (1996). See also P.J. Liacos, Massachusetts Evidence, *supra* at § 8.8.1.

(d) The mother next argues that the judge erroneously attributed statements of the father to her and then determined that she was not credible because she gave inconsistent statements. She says that she consistently maintained having no knowledge how Larry was injured, but when pressed by doctors, social workers, and investigators, she would offer possible causes suggested to her by the father, making clear that these explanations were his, and not hers. The record does not bear her out. Although she frequently said she did not know how Larry was injured, she also made statements explaining how she believed the injuries occurred.

She told Dr. Hartman, Dr. Newberger, and the investigators that Larry's perineal bruises were caused when she held him on

a bicycle for the father to photograph.[5] She testified that she believed this at the time she related it. At trial, she said she changed her belief as to the cause of these bruises, testifying that, after much thought, she realized they could not have been caused when she placed him on the bicycle. She then speculated that it happened on a bassinet at the hands of the father. These inconsistencies were entirely her own, and the judge could properly consider them when assessing her credibility. Because they were statements of a party opponent, he could consider them for any purpose. *Commonwealth* v. *Morgan, supra.*

The mother's explanation at trial of Larry's head injuries were similarly inconsistent, and based on her own beliefs. She was called as a witness by the department and testified that she knew by December 13, after leaving the second office visit with Dr. Hartman, that Larry had something more serious than an intestinal problem. After doctors at Norwood and Children's Hospitals told her Larry had suffered a head injury, she formed the belief that the father had abused Larry, but that it was "accidental." She testified she knew "back then" that Larry's head injuries were caused when his unsupported head wobbled freely while the father held him in an upright position by his midsection and rubbed his abdomen "vigorously" and "forcefully." She had seen him do this once, the week before Larry started vomiting, and told him to stop. She said the father admitted to her that he had done this to Larry on other occasions because Larry seemed to enjoy it. She did not discuss it with the father after the office visit with Dr. Hartman, and she mentioned none of this to the doctors when they asked her if she knew how Larry was injured, even though she knew that it would be better for Larry if the doctors had all available information.

The mother later testified to a different version in response to questions by her own attorney, saying that until she heard Dr. Newberger's trial testimony on April 14, 1999, she believed Larry's condition was caused by a virus. After hearing Dr.

---

[5]She also explained that this was only a hypothesis offered to Dr. Newberger as she searched for an answer to his question regarding the cause of injury. Dr. Newberger testified that the mother had offered this information spontaneously.

Newberger testify, she understood for the first time that Larry's head injuries were caused by shaken baby syndrome. She explained that her prior testimony was a result of a misunderstanding of the questions put to her by the department's attorney.

The mother testified to yet a third version of how Larry sustained his head injuries. She explained that she told a doctor at Children's Hospital that Larry injured his head by banging it against the bassinet. She did not see it happen, but her husband told her and she believed him. She testified at trial that she no longer held this belief. However, she had adopted her husband's version as her own.

Because the inconsistent statements about Larry's head injuries occurred during her trial testimony, the judge was free to choose either version, or neither, as the truth. See *Sanborn v. Brunette*, 315 Mass. 231, 237 (1943). It has been said, however, that, where a party gives inconsistent testimony and repudiates one version, as here (the mother repudiated the version given during direct examination by the department's attorney), the party is bound by the version adhered to and the fact finder may not choose the repudiated version as the truth. *Id.* Such is the rule as stated in *Sullivan v. Boston Elevated Ry.*, 224 Mass. 405, 406-407 (1916), and cases cited. The rule, though stated in general terms, has been applied to party-witnesses only where the version adhered to is less favorable to that party than the repudiated version, which typically occurs during cross-examination by the opposing party. See, e.g., *Harlow v. Chin*, 405 Mass. 697, 706-707 n.11 (1989); *Krasnow v. Fenway Realty Co.*, 352 Mass. 781 (1967); *Ruane v. Doyle*, 308 Mass. 418, 422 (1941); *Sanborn v. Brunette, supra*; *Osborne v. Boston Consol. Gas Co.*, 296 Mass. 441, 444 (1937); *Sullivan v. Boston Elevated Ry., supra*. The opposite occurred here. The mother repudiated the less favorable version during cross-examination by her own attorney. The rule as stated broadly in *Sullivan v. Boston Elevated Ry., supra*, cannot be said to apply in these circumstances. To hold otherwise would give parties the unilateral power to eliminate unfavorable aspects of their own testimony from consideration by the factfinder simply by repudiating whatever they deemed undesirable.

The mother could properly repudiate the less favorable ver-

sion of the cause of Larry's head injuries she gave on direct examination by explaining that she did not understand the questions put to her by the department's attorney. She could not, however, by such repudiation, remove that version from the judge's consideration, either for determining the truth or for impeachment purposes. Nor could she remove from the judge's consideration for all purposes her testimony that she knowingly withheld potentially material information from the doctors at Norwood and Children's Hospitals.

(e) Assuming that the father was the abuser, a critical issue in the assessment of the mother's fitness would be her current and future ability to protect Larry by keeping him away from the father. The father made no strides in addressing any propensity toward abusive behavior, and Larry could not be safely reunited with the father. The mother challenges as lacking evidentiary support the judge's finding that she "does not truly desire and intend to remain apart from [the] father." She says that it is undisputed that she and the father separated in April, 1998, and there was no evidence that they reconciled. She also says that the judge's finding that the divorce action lay dormant is clearly erroneous because the divorce action had been filed only about six months before the adoption trial concluded, the six-month waiting period under G. L. c. 208, § 1B, before which a hearing on the merits of certain divorce actions may be held had not expired, and the parties were engaged in mandatory discovery to which the father was not responding. The Appeals Court agreed, concluding that "nothing in the evidence suggested that she had done anything to resume the relationship" and that "all of the evidence suggested that the mother had been firm and resolute in pursuing a permanent separation." We disagree.

The fault in the mother's argument and the court's analysis of the evidence is that the judge viewed the separation as a sham. His findings were based on his assessment of the credibility of the witnesses and the weight of the evidence. He was in the best position to determine the facts. See *Adoption of Hugo*, 428 Mass. 219, 225 (1998), cert. denied sub nom. *Hugo P. v. George P.*, 526 U.S. 1034 (1999). The mother acknowledged telling an investigator shortly after the separation that she hoped to get back together with the father after the case was

over. Moreover, she testified in response to a question from her attorney that she was compliant with all suggestions because she wanted to get Larry back. The judge could have inferred from this exchange that the mother's cooperation with the department, including the act of separating from the father, was nothing more than acting out obligatory motions and telling department employees whatever they wanted to hear while the department's petition was still pending. The father testified that, even though he filed the divorce action, his intentions about getting divorced were not clear, and they depended on the outcome of the adoption proceeding and the parallel criminal case. The mother testified that the divorce action was "in limbo," and that she was not making any efforts to move it along, as she, too, preferred to wait until the adoption case had concluded. The judge could determine, as he did, that if Larry were returned to the mother's custody and the threat of adoption had passed, she would not carry through on her stated plan to remain apart from the father.

The judge gave as support for his finding that the mother did not intend to remain apart from the father "the nature, duration and extent of [the] mother's relationship with and dependency on [the] father, [the] mother's assertions that she hoped for the family to be able to reunite, the facts and circumstances surrounding her separation from [the] father, the fact that it was the father who filed for divorce and that the divorce has been dormant since first filed in December, 1998, her testimony that it was difficult for her to reconcile 'having to split' with him, her shift in mid-trial regarding how [Larry] was injured, and her overall lack of credibility on and off the witness stand throughout this case." There was ample support in the record for these findings, including the finding that the mother did not intend to remain apart from the father, and we cannot say that the judge was clearly wrong.

3. The mother contends that the judge erred by disregarding current evidence of her fitness in favor of stale evidence of her unfitness. The evidence of current fitness to which she refers is a statement in a court clinic report prepared during the trial in May, 1999, to the effect that the "mother made substantial changes in her life, including 'removing herself from a demoral-

izing and isolating marriage.' " The judge accorded little weight
to this conclusion by the clinician, and reached his own conclu-
sion from the evidence presented at trial. Significantly, while
the mother points to this isolated statement in the clinician's
report, the clinician indicated that Larry would not be free of
risk of abuse if he were reunited with the mother, and he did
not recommend that the mother be reunited with Larry.
Moreover, the clinician reported that the mother had characteris-
tics of "mothers associated with some increased risk for physi-
cal abuse, even in the absence of a history of violence," and
"this review of [the mother's] emotional functioning then and
now offers rather little to clarify that issue, and what it offers is
ambiguous." This evidence is not exactly the ringing endorse-
ment of current parental fitness that the mother represents. Even
if the judge credited the report, which he was not required to
do, it does not appear that it would have turned the tide in her
favor.

Finally, the judge had the opportunity to observe the mother
during the trial. Her testimony consumed nearly one and one-
half days spread over three trial days. The judge observed her
inconsistencies, and he heard her testify in response to a ques-
tion from her attorney that she was compliant with all sugges-
tions because she wanted to get Larry back. The judge was
entitled to weigh the evidence and reach his own conclusion.
His findings that the mother had not made the life changes
reported by the clinician, and that she had not extricated herself
from her dependency on the father, were supported by the
evidence. The judge could properly consider past parental
conduct as relevant to the issue of current parental fitness where
that conduct was not too remote, especially where the evidence
supported the continuing vitality of such conduct. See *Adoption
of Paula*, 420 Mass. 716, 729 (1995), and cases cited. The
mother has not shown that the judge was clearly wrong in find-
ing that what she calls "stale" information was essentially still
quite fresh.

4. The mother argues that it was error for the judge to penal-
ize her for not separating from the father until nearly four
months after Larry was taken from them. The judge did no such
thing. He merely considered the delay in separation as one of

many pieces of evidence on the question of the mother's rooted dependency on the father, all of which led him to find that she does not intend to remain apart from the father. There was no error.

5. There is no merit to the contention that the judge did not consider the statutory factors set forth in G. L. c. 210, § 3 (*a*). The judge was aware of the factors and specifically stated that he considered each. He made specific findings as to the four factors that he determined were applicable, and said nothing of the others. That is all that was required of him.

6. The mother's argument that the department failed to make a good faith effort to assist her in the goals it identified in its service plan, raised for the first time on appeal, has not been preserved for appellate review and we do not consider it. See *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption*, 392 Mass. 696, 697 (1984).

7. *Burden shifting*. The mother argues that the judge impermissibly shifted the burden of proof from the department to her, requiring that she present affirmative evidence that she did not harm Larry, or that she did not know that the father abused Larry. The burden of proof in care and protection cases and proceedings to dispense with consent to adoption is on the petitioner to prove current parental unfitness by clear and convincing evidence. See *Care & Protection of Laura*, 414 Mass. 788, 790 (1993). The burden never shifts to the parents. See *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption*, 389 Mass. 793, 802-803 (1983).

The judge did not call on the mother to prove anything. He correctly stated the burden of proof in his conclusions of law. He never touched the erroneous course that the mother suggests. The judge correctly understood that the department could prevail against the mother only if it could show that, even if she did not abuse Larry, she nevertheless was unfit because she was unable to protect him from future harm. From the application of deductive reasoning to known circumstances he determined that the department had met its burden. There was no burden shifting. See *Adoption of Lorna*, 46 Mass. App. Ct. 134, 141 (1999).

8. *Sufficiency of the evidence of unfitness*. The element of

parental unfitness must be proved by clear and convincing evidence. See *Care & Protection of Laura, supra.* The mother argues that the department failed to meet its burden of proof, and the Appeals Court agreed.

As discussed in Part 2 (e), *supra*, the evidence supports the judge's finding that the mother did not intend to remain apart from the father, and she would therefore be unable to protect Larry from future abuse. This case is distinguishable from *Care & Protection of Isabelle*, 33 Mass. App. Ct. 548 (1992), on which the mother relies. There, the mother had taken aggressive steps toward separating from the father, conclusively terminating her relationship with him by the time of trial. *Id.* at 552. She was also aggressive in protecting her child, promptly reporting the father to the department when she learned that he arranged an unauthorized visit with the child. She also never let the father visit with her child after being told that he raped his son, even though she did not believe that the father had done so. Here, the mother made no effort to separate from the father and took no action toward dissolving their marriage, despite significant evidence that the father had repeatedly abused their infant son. To the contrary, she expressed a desire to reunite, and became angry with the father, after he moved out, for removing his wedding ring. Her sworn preference was to wait and see what happened in the adoption case before proceeding with a divorce. The judge's findings are not impermissibly anchored to a mere disbelief of the mother's testimony. See *Custody of Two Minors*, 396 Mass. 610, 619 (1986). The evidence indicates a strong level of dependency on the father by the mother, and a continuing intention against severing their relationship. There was a sufficient basis to believe that the separation was a sham, that the forces that had kept the parents together were still in place, and that those forces would prevail if Larry were returned to the mother.

The judge also concluded that the mother had been unable to protect Larry from the father, and that she remained unable to protect him. The mother contends that there is no evidence she knew about Larry's bruises in time to prevent any further injury to Larry. To the contrary, there is evidence that she knew about the bruises but took no protective measures to ensure that the

father would not continue to injure Larry while she was at work. Nor did the mother act to protect Larry when the severity of his symptoms of head injury emerged. The mother never discussed Larry's head injuries with the father after leaving Dr. Hartman's office on December 13, when she first realized that Larry was suffering from something more than a virus. She admitted never telling any of the doctors, while they were trying to diagnose Larry's condition, that the father may have injured Larry by rubbing his abdomen forcefully and letting his head wobble freely, knowing that might be material information that could help Larry. She maintained at the time of her testimony that she still believed that the father injured Larry accidentally. Her willingness to protect the father, and not Larry, and to be so forgiving of the father in the face of overwhelming evidence that Larry's head injuries were caused not by an accident, but by intentional, violent shaking for some thirty seconds, is clear and convincing evidence that she cannot protect Larry from the father. She never tried to help the father improve and correct his parenting skills or help him realize how he may have injured Larry. Notwithstanding her promise to make him attend counselling if the family could stay together, she described their failure to attend joint counselling as their mutual procrastination. Her persistent refusal or inability to recognize and address the father's intentional, violent conduct is further evidence of her attachment to the father, an attachment that is inimical to Larry's well-being. This case is markedly different from *Care & Protection of Isabelle, supra.*

We are satisfied that the judge's finding of current parental unfitness is supported by clear and convincing evidence, and that his findings demonstrate that "close attention has been given the evidence." *Care & Protection of Laura, supra* at 791.

*Decrees affirmed.*