The mother and the father of Dalila, Peter, and Anne each appeal from decrees of the Juvenile Court terminating their parental rights to the three children. We affirm.
Discussion. 1. Scope of review. "In determining whether to dispense with parental consent to adoption, a judge must 'evaluate whether the [parent is] able to assume the duties and responsibilities required of a parent and whether dispensing with the need for parental consent will be in the best interests of the children.' " Adoption of Nancy, 443 Mass. 512, 514 (2005), quoting from Adoption of Mary, 414 Mass. 705, 710 (1993). See G. L. c. 210, § 3 ; Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012). The judge must conduct a two-part analysis: the judge must first determine "parental unfitness by clear and convincing evidence," and "[a]fter ascertaining unfitness, the judge must determine whether ... it would be in the child's best interests to end all legal relations between parent and child." Adoption of Nancy, supra at 515. The two inquiries "are not separate and distinct, but 'reflect different degrees of emphasis on the same factors.' " Ibid., quoting from Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption, 367 Mass. 631, 641 (1975).
Before terminating parental rights, the judge is required "to make specific and detailed findings, demonstrating that close attention has been given to the evidence." Adoption of Gregory, 434 Mass. 117, 126 (2001). The judge's subsidiary findings of fact must be supported by a preponderance of the evidence. Ibid. "We give substantial deference to a judge's decision that termination of a parent's rights is in the best interest of the child, and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Ilona, 459 Mass. 53, 59 (2011).
2. The mother's appeal. a. Current unfitness. The mother argues that the judge's finding of her unfitness was not supported by clear and convincing evidence in that none of the judge's findings concerned any current "grievous shortcomings" that would put the children's welfare at hazard. Adoption of Greta, 431 Mass. 577, 587 (2000), quoting from Adoption of Katharine, 42 Mass. App. Ct. 25, 28 (1997).
While a judge cannot rely on stale information as a rationale for a finding of current parental unfitness, "prior parental conduct is deemed relevant." Adoption of Jenna, 33 Mass. App. Ct. 739, 744 (1992). "The judge could properly consider past parental conduct as relevant to the issue of current parental fitness where the conduct was not too remote, especially where the evidence supported the continuing vitality of such conduct." Adoption of Larry, 434 Mass. 456, 469 (2001).
The evidence clearly and convincingly supported the judge's finding of the mother's current unfitness. The judge found that the mother repeatedly subjected the children to serious neglect and domestic abuse. See G. L. c. 210, § 3(c )(ii), (ix). The mother repeatedly exposed her children to trauma and was resistant to utilizing assistance. The children are especially sensitive to noise and fighting as a result of their earlier experiences of trauma. The two older children deeply distrust the mother (and the father) after years of continuous emotional abuse and neglect. All of the children have developed special needs[3] and they fear returning to the mother's care. See G. L. c. 210, § 3(c )(iv), (vii).
The judge properly relied on the mother's past behavior toward the children, as its effects are still present and the mother exhibits a continuing inability to adequately address her personal issues. See Adoption of Larry, supra ("[T]he mother has not shown that the judge was clearly wrong in finding that what she calls 'stale' information was essentially still quite fresh"). Despite years of services, the mother continues to have experiences of "overexcitement" and does not recognize when her voice is raised. Despite her mental health hospitalizations in high school and "sensitiv[ity] to spirits," the mother does not believe that she has psychological needs and is resistant to receiving services. While the mother (and the father) showed some improvement in their parenting abilities after the children's removal, the children's behavior and development deteriorated with increased visitation time.
The mother may be dissatisfied with the judge's weighing of the evidence and her credibility determinations; however, "[w]e see no basis for disturbing the judge's view of the evidence." Adoption of Quentin, 424 Mass. 882, 886 n.3 (1997). The mother's past shortcomings, in addition to her unresolved issues that render her unable to parent her children, firmly support the judge's determination of unfitness.
b. The mother's cognitive limitations. The mother contends that one particular subsidiary finding-that the absence of developmental disability services did not compromise her ability to parent-is clearly erroneous. Specifically, the mother claims that the judge ignored the clinical requirements that made her eligible for services and instead selectively relied on the mother's employment history.
The mother has not demonstrated that the judge's finding was clearly erroneous. A subsidiary finding is clearly erroneous when there is no evidence to support it, or when, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Custody of Eleanor, 414 Mass. 795, 799 (1993), quoting from Building Inspector of Lancaster v. Sanderson, 372 Mass. 157, 160 (1977).
In making the challenged finding, the judge considered the conflicting evidence, including the testimony of the mother's expert, Thomas F. Carr, that the mother required, yet did not receive, appropriate services; the fact that the Department of Developmental Services (DDS) accepted the mother as a client; the mother's personal, educational, mental health, and employment history; and the fact that the "[m]other has served, and continues to serve, in responsible caretaking positions, without having had specialized training addressing her alleged disability."[4] Additionally, the mother demonstrated a capacity to utilize some of the nonspecialized services, such as home-based parenting support, that she did receive from the Department of Children and Families (DCF). In the context of the evidence as a whole, the finding was "clear ... [and] amply supported by the record," Care & Protection of Martha, 407 Mass. 319, 328 (1990), and we are not persuaded that the judge erred. See Custody of Eleanor, supra.
Alternatively, the mother contends that by failing to provide specialized services to address her cognitive limitations, DCF violated its mandate to provide reasonable efforts to preserve family integrity.[5] See Adoption of Ilona, 459 Mass. at 61 ("Where a parent ... has cognitive or other limitations that affect the receipt of services, the department's duty to make reasonable efforts to preserve the natural family includes a requirement that the department provide services that accommodate the special needs of a parent" [emphasis supplied] ).
The judge was not bound to find that DCF failed to make reasonable efforts. The mother received years of services tailored to meet her needs.[6] Moreover, DCF's "obligation to work with the mother was contingent upon her own obligation to fulfill various parental responsibilities, including seeking and utilizing appropriate services." Adoption of Daisy, 77 Mass. App. Ct. 768, 782 (2010), quoting from Adoption of Serge, 52 Mass. App. Ct. 1, 9 (2001). The mother, however, resisted addressing her mental health issues and did not see a psychiatrist for several years. Her delay in utilizing recommended services undermines the mother's argument.
DCF surely paid insufficient attention to the mother's cognitive limitations. Although the lead social worker helped the mother apply for DDS services, the social worker did not know what services DDS might have offered and failed to follow up on the issue. However, other than criticize DCF's parenting plan for providing inadequate services and suggesting "specific programs to deal with people with developmental delays," the mother did not show what additional services she could have obtained from DDS or how they might have improved her parenting abilities more than the tailored services that DCF did offer. Moreover, even "[a] determination by the court that reasonable efforts were not made shall not preclude the court from making any appropriate order conducive to the child's best interest." G. L. c. 119, § 29C, as appearing in St. 2008, c. 176, § 87. See Adoption of Ilona, supra. We discern no clear error or abuse of discretion in the judge's determination that the mother was unfit notwithstanding the absence of services to specifically address her alleged cognitive limitations.
c. Remaining statutory factors. The mother contends that the evidence does not support the judge's application of G. L. c. 210, § 3(c )(ix), and that the judge must have improperly relied on the children's out-of-court statements, which were admitted only for the children's state of mind, to find evidence of ongoing abuse and neglect. We disagree.
The turmoil in the parents' relationship is documented through the observations of social workers, a police officer, and the mother's own testimony. DCF removed the children from the parents' home for allegations of abuse and neglect three times, on August 13, 2011,[7] November 16, 2011,[8] and in October, 2012. Multiple G. L. c. 119, § 51A, reports document the repeated abuse and neglect of the children. See Adoption of Rhona, 57 Mass. App. Ct. 479, 484 (2003). The mother (and the father) consistently failed to meet the children's basic health and hygiene needs.[9] The judge acknowledged but did not credit the parents' denials of domestic violence. See Care & Protection of Three Minors, 392 Mass. 704, 711 (1984) (credibility determinations are within judge's discretion). The evidence was sufficient for the judge to apply G. L. c. 210, § 3(c )(ix), based on repeated instances of neglect and the children's exposure to domestic violence.
The mother further contends that the judge erred in applying G. L. c. 210, § 3(c )(vii), based solely on her finding that the children had bonded with their respective caregivers. In this regard, the judge relied upon the children's "strong bonds with their foster parents that the [c]hildren wish to become permanent" as one of the reasons for terminating the mother's parental rights. "Although the bonding of a child with foster or adoptive parents is not a dispositive consideration, it is a factor that has weight in the ultimate balance." Adoption of Nicole, 40 Mass. App. Ct. 259, 262-263 (1996).
When the separation between the foster parent and the child becomes "a decisive factor, a judge would be bound in findings to describe the nature of the bonds formed, why serious psychological harm would flow from the severance of those bonds, what means to alleviate that harm had been considered, and why those means were determined to be inadequate." Adoption of Rhona, 57 Mass. App. Ct. at 492, quoting from Adoption of Katharine, 42 Mass. App. Ct. at 30-31. However, this is not a case where the judge's determination is solely based on the children's bonding with the foster parents. Rather, it was one of many factors supporting her ultimate conclusion. Compare Adoption of Rhona, supra ("The judge relies on the bond between Rhona and her foster parents as a significant basis for his determination").
The judge properly considered the children's development while living with the parents and contrasted it with the children's development after removal. See Adoption of Kimberly, 414 Mass. 526, 530-531 (1993). While the mother (and the father) "have not been able to foster a basic feeling of trust and security in the [c]hildren that is necessary for their development," each child's welfare greatly improved in the care of their foster families.
The judge found that security is essential for each of the children's welfare and development. The judge credited the testimony of the forensic evaluator that Peter could "not cope with possibility of losing his secure attachment to his foster parents." If Dalila and Anne were to be returned to the parents' care, the transition would have to be gradual, "possibly involving ... an intermediate, 'neutral,' placement." The guardian ad litem testified that, if returned to the parents' care, Dalila and Anne would need "very intensive services" for "an unspecified period of time." Given the children's elevated needs, the judge did not err in considering the psychological impact to the children of removal from their foster placements.
d. Conclusion. In considering the pattern of abuse and neglect as well as the progress the children have made since leaving the home, the judge did not abuse her discretion in finding the mother unfit and that the best interests of the children would be served by terminating the mother's parental rights.
3. The father's appeal. The father contends that he should not have been found unfit because the evidence does not clearly and convincingly establish that his parenting put the children's welfare, particularly Dalila's, at hazard. The father also argues that his plan to hire a nanny was reasonable, and the judge erred in rejecting it.
Although the father demonstrated improvement in his parenting abilities, after careful evaluation of the record and the judge's conclusions, we are satisfied that the judge did not err in finding the father unfit.[10] Most of the factors supporting the finding of the mother's unfitness-including the inability to maintain a clean, safe home, the lack of care for the children's basic health and hygiene, and domestic violence-equally reflect on the father's shortcomings as a parent. All of the children, including Dalila, have heightened needs that the father (and the mother) are unable to meet. The father allowed the children to suffer abuse and neglect for years, and he makes no claim of cognitive limitations.
The judge was entitled to give little weight to the father's proposal to hire a nanny. The father has a strenuous work schedule. In the past, he had not been able to comply with the condition that the children not be left alone with the mother, and the judge could properly rely on this conduct to assess the father's current fitness. DCF had previously approved the hiring of a nanny as a way for the father to work around the mother's parental unfitness, but the mother's resistance thwarted the attempt. Returning the children to the father would effectively amount to returning them to the mother's care. The judge could reasonably conclude that the employment of the nanny was not a viable option and that the father had no realistic plan to care for any of the children.
The father also contends that DCF's mismanagement of the case should be a mitigating factor negating a determination of unfitness. While the delivery of services in this case was not perfect, even if the judge had considered DCF's handling of the case as a mitigating factor, which she was not required to do, it would not undermine the ultimate conclusion that the father was and would remain unfit and that terminating his parental rights was in the best interests of the children. We discern no error or abuse of discretion.
Decrees affirmed.

All three children have been diagnosed with posttraumatic stress disorder and have substantial emotional needs. Anne also has physical disabilities, and consistency of care is extremely important for her health and development. Dalila and Peter have developmental delays and special educational needs.

Since 2013 through the time of trial, the mother worked two hours per day as a certified home health care aide without receiving any complaints about her work performance. To become a personal care aide, the mother attended nonspecialized classes and received a certificate of completion.

"[T]he court ... shall determine whether [DCF] or its agent, as appropriate, has made reasonable efforts prior to the placement of a child with [DCF] to prevent or eliminate the need for removal from the home." G. L. c. 119, § 29C, as appearing in St. 2008, c. 176, § 87. See Care & Protection of Walt, 478 Mass. 212, 220-221 (2017).

DCF provided early intervention services to work with the mother in caring for Anne as an infant; an intensive home-based counsellor to come into the home two or three times per week to assist the mother with parenting skills, supervising the children, and making medical appointments; help in applying for Section 8 housing assistance and services from DDS; and a psychiatrist.

Watertown police responded to a neighbor's report. The mother admitted to drinking six beers and had blood alcohol content of 0.158 percent. Anne had been left unattended in her carrier. Peter, then three years old, was wandering about the apartment, while Dalila, then five years old, was "hysterically crying." Officers sent Dalila to the hospital for a possible head injury. Multiple mandated reporters filed G. L. c. 119, § 51A, reports alleging physical abuse of Dalila by the mother and neglect of all three children.

DCF social worker Laurie Winn visited the mother's home and found three year old Peter and five month old Anne home alone. The mother was absent for thirty minutes. Winn then filed a 51A report against the mother, and the children were removed from the home and placed in foster care that same day. DCF later discovered that the mother refused to work with the nanny and that the nanny had stopped working with the family.

On one occasion police officers found the apartment in "complete disarray with various items strewn about the house including numerous soiled diapers on the floor, trash, clothing, and other pieces of furniture tipped over." On another occasion, "food was largely absent." The children had "significant dental problems," and "most of [Dalila's] top teeth had been pulled, and many of the remaining ones had been capped."

The judge noted, and we agree, that the term "unfit" is not meant to reflect a moral judgment, but rather an assessment of a parent's ability to meet the basic needs of a particular child or children.