NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-409

ADOPTION OF DAESHA.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

After a bench trial, a Juvenile Court judge found the mother to be currently unfit to parent her child, that her unfitness was likely to continue unabated into the future, that it is in the child's best interests that the mother's parental rights be terminated, and that the plan of the Department of Children and Families (DCF) that the child be adopted by the mother's cousin, the child's godfather (godfather), and his wife is in the child's best interests.  The mother appeals, arguing that the judge abused his discretion because the child's best interests could have been served without the extreme step of severing the legal relationship between the mother and child. Within this overarching contention, the mother makes four specific subsidiary arguments.  First, she contends that the judge did not give adequate weight to the progress she demonstrated during the period between October 1, 2019 (when the mother stipulated to an adjudication that the child was in need

of care and protection) and the time of trial (on various dates between September 2021 and January 2022).  Second, she argues that there was no nexus between her mental health issues and her ability to parent the child.  Third, she contends that the judge erroneously relied on stale evidence.  Fourth, the mother asserts that the child's present and future welfare do not demand termination of the mother's parental rights because guardianship with the godfather and his wife was an available alternative.

Discussion.  In deciding whether to terminate a parent's rights, a judge must determine whether there is clear and convincing evidence that the parent is unfit and, if so, whether the child's best interests will be served by terminating the legal relation between parent and child.  See Adoption of Nancy, 443 Mass. 512, 515 (2005).  We defer to a trial judge's decision to terminate and "reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion."  Adoption of Ilona, 459 Mass. 53, 59 (2011).  "A finding is clearly erroneous when there is no evidence to support it, or when, 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'"  Adoption of Larry, 434 Mass. 456, 462 (2001), quoting Custody of Eleanor, 414 Mass. 795, 799 (1993).

2

1.  Mother's progress.  The mother points out, and the judge found, that the mother began to take some positive steps beginning in 2021 towards addressing her challenges and parental shortcomings.  For example, the mother began working regularly with Tyeisha Genty, a family support and stabilization specialist from Cambridge Family and Children Services, on a weekly basis beginning in January 2021, and the mother began individual therapy in August 2021.  The mother had also located housing.  The mother is to be commended for making these changes and efforts, but it was open to the judge to assess whether -- as of the time of trial (September 2021 through January 2022) -- they were sufficient to overcome the evidence of unfitness over many years, including during 2021.  See G. L. c. 210, § 3 (c) (viii) (parent's lack of effort to be considered in assessing parent's fitness).  We "afford deference to the judge's assessment of the weight of the evidence and the credibility of the witnesses, as well as to the judge's determination of the child's best interests, reversing only if there is clear error or abuse of discretion."  Adoption of Jacob, 99 Mass. App. Ct. 258, 266 (2021).

The mother's history before October 1, 2019 (when she stipulated that the child was in need of care and protection), included serious mental health issues requiring multiple hospitalizations, dysregulated behavior that included physical

assaults on family members and others, unlawful and dangerous operation of a motor vehicle, violations of restraining orders, threats to abscond with the child, and attempted larceny from a store and assault and battery on a store employee for which she was ultimately found guilty after several probation violations. Throughout this period, the maternal grandmother was the child's primary caretaker; in fact, the grandmother was appointed the child's guardian in April 2015. The mother does not dispute the accuracy of the judge's findings numbered one through sixty-nine, which pertain to the mother's unfitness during the period before the October 1, 2019 stipulation.

The evidence also supported the judge's findings for the period after the stipulation. For example, the mother's housing situation was not stable. As of October 1, 2019, it appears that the mother lived at Putnam Gardens in Cambridge, where the child could not be placed because other residents in the home were the subject of an open DCF case. In addition, the child could not remain with the maternal grandmother because the grandmother was unable to separate the mother from the child. In November 2019, the mother proposed that she enter a shelter with the child, but this was not a viable option because it would remove the mother and child away from needed supports, services, and medical providers. Prior to moving into an

4

apartment in March 2021, the mother stayed with her mother for a short period of time and slept in her car at times.

There was also evidence that the mother did not engage in therapy to address her mental health and behavioral issues. Indeed, there was evidence that the mother did not even acknowledge the need for therapy for a long time. For example, despite having referrals for individual therapy, the mother did not engage in individual therapy from July 2019 through January 2020. In February 2020 and May 2020, a DCF caseworker again emphasized to the mother the need to engage in individual therapy, but the mother continued to believe that therapy was not necessary. Although the mother initially participated in appointments with the Family Intensive Reunification and Stabilization Team (FIRST), she refused contact with FIRST in July 2020 and stopped working with them. The mother again declined to participate in therapy, psychiatry, and anger management services in September 2020 and October 2020.

There was also evidence that, on numerous occasions and in a variety of contexts, the mother was unable to regulate or control her reactions and behaviors. For example, during visits with the child, the mother did not observe COVID-19 masking protocols, or require family members and others to do so, despite the child's vulnerability due to sickle cell disorder. When DCF personnel imposed rules on the mother regarding

5

visitation (such as complying with COVID-19 protocols and requiring that the visits be supervised), the mother would scream, threaten to remove the child, threaten to commit physical assault on the DCF worker, or make inappropriate remarks.[1]

The mother's inability to regulate her behaviors also led to criminal conduct and charges, with ramifications for the child. For example, the mother was charged with various criminal offenses after she struck a pedestrian while driving and caused serious injuries. During her incarceration, the mother chose not to have visits with the child from late August 2020 to early October 2020.[2] In 2021, the mother engaged in conduct that resulted in criminal charges for unlawful operation of a motor vehicle, assaulting a police officer, resisting arrest, assault and battery on ambulance personnel, and assault and battery with a dangerous weapon. She also had episodes of unregulated behavior towards caseworkers, including threats and

---

[1] For example, on one occasion, the mother sent a text to a DCF caseworker stating, "You retarded-ass-bitch, I told you to either text me or email me. I don't want to hear your voice. Stop calling me."

[2] The mother also missed some visits with the child between October and December 2020. She also missed visits with her daughter during April and May 2021 due to her placement in a recovery center.

physical assault.  At the time of trial, many of the criminal charges on the mother's record remained open.

We recognize that many of the mother's shortcomings likely stem from underlying mental and emotional health issues rather than from a lack of love for the child.  See Adoption of Bianca, 91 Mass. App. Ct. 428, 432 n.8 (2017).  We also recognize that the mother began to take positive steps in 2021 by finally engaging in individual therapy.  But the judge did not abuse his discretion by concluding that these steps were not of sufficient duration or significance to show that the mother's longstanding issues were merely temporary or would likely resolve.  See Adoption of Elena, 446 Mass. 24, 31 (2006).  This was not a case where the mother made "significant progress" with respect to the areas of concern.  Contrast Adoption of Carlos, 413 Mass. 339, 351 (1992) (mother made "significant progress" with respect to "critical area of parental unfitness").

2.  Nexus of mental health issues to parental fitness.  The mother correctly points out that "[w]hen assessing parental fitness, it is not enough to state that a parent is mentally impaired, rather there must be a showing that the condition affects the parent's ability to care for the child."  Adoption of Leonard, 103 Mass. App. Ct. 419, 424 (2023), quoting Adoption of Quentin, 424 Mass. 882, 888 (1997).  She argues that no such nexus was established on the evidence in this case.  We

7

disagree.  The evidence showed that the mother had long-term mental health issues that impaired her ability to regulate her behavior and to parent the child.  This dysregulation led to: the mother being unable to parent the child without significant support from the day the child was born, the need for the maternal grandmother to be the child's guardian, the mother's unstable housing, the mother's criminal conduct resulting in incarceration (and an attendant lack of visitation with the child), the mother's physical confrontation and aggression with family members, DCF caseworkers, and police, the mother's verbal confrontation and threats, and the mother's inability to comply with or understand reasonable requests by DCF workers as to tasks that would be helpful to the child or were necessary to achieve reunification.  All of these consequences of the mother's dysregulated behavior were inimical to the child's wellbeing.

The mother points to a hospital psychiatrist's view in 2015 (at the time of the child's birth) that the mother would be capable of parenting the child with "a lot of support," as well as her long-term psychiatrist's statement to the court investigator in 2018 that the mother was "an intelligent person who may have the potential to parent [the child] with a lot of support," as indicative of the lack of nexus between her mental health and the need to terminate her parental rights.  Setting

aside that this evidence dated from three to six years before trial and did not amount to an endorsement that the mother was fit, the fact remains that, by the time of trial, the mother's conduct during the subsequent years had not borne out these hopes. See Adoption of Nancy, 443 Mass. at 517 (judge not required to wait indefinitely to see if parent could address parental shortcomings).

3. Stale evidence. The mother argues that the judge relied on stale evidence at the expense of more recent evidence that the mother was making progress. This is, in some sense, a variant of her first argument, and it fails for similar reasons. Although it is true that the mother began to take steps towards addressing her mental health issues in 2021, this evidence does not necessarily offset the ample evidence that the mother's patterns of dysregulated behavior, as well as the ramifications to the child from it, continued through the time of trial. "[E]vidence of such ongoing patterns of parental neglect or misconduct, especially 'where unrebutted by more recent proof of parental capacity, [can] provide[] a satisfactory basis for a finding of current parental unfitness'" (emphasis omitted). Adoption of Don, 435 Mass. 158, 165 n.10 (2001), quoting Custody of a Minor (No. 1), 377 Mass. 876, 883 (1979).

4. Guardianship versus termination. Finally, the mother argues that the judge should not have terminated the mother's

9

parental rights, and that permanency for the children could have been achieved through guardianship instead. Setting aside that the record does not show that the mother took this position at trial, the judge did not abuse his discretion is concluding that the adoption plan proposed by DCF was in the child's best interests. As the judge explained, at the time of trial, the child had been in the home of her godfather and his wife for over three years. She was fully integrated into their household and was thriving in their care. The placement would keep the child within her birth family and grounded in her ethnic and cultural heritage. The godparent and his wife have experience raising a child with sickle cell disorder, and they have demonstrated good management of this condition with respect to the child. The child wishes to be adopted by the godparent and his wife, sees them as her parents, and views their children as her siblings. See Adoption of Nancy, 443 Mass. at 518-519.

Decree affirmed.

By the Court (Wolohojian, Milkey & D'Angelo, JJ.[3]),

Assistant Clerk

Entered: February 6, 2024.

---

[3] The panelists are listed in order of seniority.