## Adoption of Cecily.[1]

No. 12-P-926.

Essex. January 3, 2013. - June 7, 2013.

Present: Graham, Grainger, & Sikora, JJ.

*Adoption,* Care and protection, Dispensing with parent's consent, Visitation rights. *Minor,* Adoption, Visitation rights. *Parent and Child,* Adoption, Dispensing with parent's consent to adoption. *Grand Jury. Evidence,* Testimony before grand jury. *Practice, Civil,* Adoption.

At proceedings on a care and protection petition, the Juvenile Court judge did not err in admitting, for their probative value, those portions of the maternal grandmother's grand jury testimony that were inconsistent with her trial testimony [723-724]; further, any error in admitting the entirety of her testimony was harmless, because the testimony was merely cumulative of properly admitted evidence and therefore likely to have had very slight effect, if any, on the fact finder [724]; finally, the mother failed to meet her burden to demonstrate abuse of the judge's discretion in denying the mother's motion to recall the grandmother as a witness [724-725].

At proceedings on a petition to adjudicate a child in need of care and protection and to dispense with the mother's consent to adoption, the evidence was sufficient to support a finding that the mother was unfit to parent the child, where the facts clearly supported findings that the mother had left the child in the care of someone (i.e., the father) who was known to be at risk to harm the child and that the mother failed to acknowledge overwhelming evidence that the father had caused horrific injuries to the child and to separate from him [725-726]; further, the judge's subsidiary finding that the mother was present while the father shook the child was not clearly erroneous [726-727]; finally, the judge did not give undue weight to a negative inference drawn against the mother for not testifying at trial [727].

At proceedings to dispense with the mother's consent to adoption of her child, the judge did not err in failing to order posttermination visitation, where no bond existed between the child and the mother. [727-728]

Petition filed in the Essex County Division of the Juvenile Court Department on July 29, 2009.

The case was heard by *Joseph F. Johnston,* J.

---

[1]A pseudonym.

*Patricia Quintilian* for the mother.

*Kari B. Kipf-Horstmann* for Department of Children and Families.

*Jessica Berry* for the child.

GRAHAM, J. The mother appeals from a decree of the Juvenile Court entered on November 30, 2011, adjudicating her daughter, born in May of 2009, in need of care and protection and dispensing with the mother's consent to adoption. She contends that the evidence of her parental unfitness was not clear and convincing, that one of the judge's key findings is not supported in the record, that the judge erred in admitting in evidence grand jury testimony of the child's maternal grandmother for full substantive evidentiary value, that the judge erred in drawing a negative inference against the mother because she did not testify at trial, and that the judge erred in denying her posttermination visitation. We affirm.

*Background.* We take the facts from the judge's detailed findings and the uncontradicted evidence before him, reserving recitation of certain facts as they become relevant to the issue raised. The mother, a secretary at the Lynn Community Health Center, was born in the Dominican Republic and came to the United States with her family when she was six years old. The father[2] first came to the United States in 1996 with a ten-year visa which has expired; he is not a United States citizen. The mother and father met in 2007 and married in 2008. The following year, the mother's only child, Cecily, was born. After a six-week maternity leave, the mother, who was the sole financial provider for the family, returned to work, and the father was the sole caretaker for Cecily while the mother worked from 8:30 A.M. to 5:00 P.M. during the week.

In July, 2009, shortly after the mother's return to work from maternity leave, she came home to find Cecily, then two months old, with bruises on her cheek. The father disclaimed any knowledge about the bruising. The next day the mother received a call in the afternoon from the father that Cecily was "fussy" and did not look well. The mother came home early and she and the father took Cecily to the North Shore Children's Hospital

---

[2] The father is not a party to this appeal.

emergency room. There they reported that Cecily "had been fussy since the previous day, had an unusual sleep pattern, and was not smiling."

A physical examination of Cecily revealed bruising to her face and buttocks, and a computer tomography (CT) scan showed that she suffered an acute subdural hematoma and edema (swelling) of the brain. Cecily began experiencing seizures and was transferred to Children's Hospital Boston, in critical condition, where she underwent surgery to alleviate the swelling of her brain. Cecily was also diagnosed with retinal hemorrhages in both eyes, rib fractures that were in various states of healing, a broken arm, and a broken leg. Both parents denied inflicting or witnessing any trauma to Cecily, but admitted to being her only caretakers.

After two weeks in intensive care, Cecily was transferred to a rehabilitation hospital. Despite extensive therapy, at trial Cecily had significant delays in all areas of her development: her vision was severely impaired; she could not crawl; she could not balance well; and she easily toppled. She was released into the care of a foster mother with whom she still lived at the time of trial.

The Department of Children and Families (department) became involved in the case when a G. L. c. 119, § 51A (§ 51A report), was filed against the mother and father for neglect of the child on the day she was admitted to the hospital. The next day, the department was granted emergency custody of the child. A second § 51A report, alleging that the child had been physically abused, was filed shortly thereafter. The department then began a G. L. c. 119, § 51B, investigation, during which it found the allegations of physical abuse and neglect of the child to be supported.

The Lynn police also began an investigation. In connection with that investigation, Cecily's maternal grandmother voluntarily went to the police station and gave a statement three days after Cecily's admittance to the hospital. She later testified before a Essex County grand jury, that twice she had seen the father, with the mother present, violently shaking the child just weeks before the child was hospitalized. In the first incident, he grabbed the child by the waist "like how you grab a cleaning

rag" and shook her, yet the mother did nothing to protect Cecily. In the second incident, he lifted the child with one hand above his head moving her up and down "like a ball." In September, 2009,[3] the mother and father were indicted by the grand jury on several criminal charges.

In July, 2009, the department filed a care and protection petition regarding Cecily. The department's initial goal, outlined in their first service plan spanning August, 2009, until February, 2010, was to return Cecily to the mother and father. In October, 2009, the department's goal changed from reunification to adoption. Subsequently, the mother began to comply with service plan tasks, as amended to reflect changes in the department's goals, and a visitation schedule was provided for the mother and Cecily.

At the trial to terminate the mother's and father's parental rights, several of Cecily's treating physicians, including a child abuse specialist, two ophthalmologists, and a radiologist, testified as witnesses for the department regarding the diagnosis, genesis, and etiology of her injuries. Their unanimous opinion was that Cecily's injuries were inflicted, and not accidental. Three experts retained by the mother and father, none of whom examined Cecily, testified at trial. They contended that the injuries she suffered were the result of a constellation of previously undiagnosed conditions including chronic subdural hematoma, rib injuries from birth, metabolic bone diseases (brittle bones), and blood clotting disease. In his findings, the judge credited the testimony of Cecily's treating doctors and rejected the testimony of the parents' expert witnesses on the basis that their opinions were not supported by the medical records in the case.

Ultimately, the judge terminated the parental rights of both

---

[3]At the time of trial, the criminal cases against both parents were pending. The mother was charged with assault and battery on a child with substantial injury and reckless endangerment of a child. At the close of the Commonwealth's case, the mother moved for a required finding of not guilty on all charges and the judge granted her motion. The father was charged with two counts of assault and battery on a child with substantial injury and was later found guilty on the first count and not guilty on the second. The father was sentenced to nine to twelve years at the Massachusetts Correctional Institution at Cedar Junction.

the mother and father. With respect to the mother, the judge concluded that she had failed to protect the child from conditions that were clearly harmful to the child, and that she lacked the insight needed to protect the child from future harm, thereby rendering her unfit to parent the child. As a result, he issued a decree terminating both parents' right to receive notice of or to consent to any legal proceeding affecting Cecily, including any department-proposed plan of adoption. He found this to be in Cecily's best interests.

*Grand jury testimony.* At trial, the maternal grandmother essentially recanted her statements to the Lynn police and to the grand jury in which she stated that she saw the father shake Cecily, claiming that she misunderstood the questions and that her answers to questions by the police were misconstrued. Instead, she related a very different account of the father's treatment of Cecily. She claimed that she had never seen the father shake Cecily; rather, she saw him playing with her, moving her up and down slowly.[4] The maternal grandmother's testimony at trial was clearly inconsistent with her statements to the police and her testimony before the grand jury.

Over the mother's objection, the judge allowed the department to introduce portions of the maternal grandmother's grand jury testimony for their full probative value. As a general matter, the prior inconsistent statement of a witness may be introduced, but only for purposes of impeachment. See *Commonwealth* v. *Bookman*, 386 Mass. 657, 665 (1982). However, prior inconsistent testimony by a witness before a grand jury, under certain conditions, can be admitted as substantive evidence. "With regard to inconsistent grand jury statements, we are satisfied that the truth-seeking function of trials may be enhanced rather than diminished if consideration of their probative value is permitted. . . . We believe that a fact finder should be permitted to prefer a grand jury statement made closer in time to the events at issue over contradictory trial testimony that the passage of time and intervening influences may have affected." *Commonwealth* v. *Daye*, 393 Mass. 55, 71 (1984). Three general

---

[4]The maternal grandmother testified, generally, that the father was merely playful with Cecily and expressed her belief that the father was not the cause of Cecily's injuries.

conditions must be met before the use of such testimony: "(1) there must exist an opportunity for effective cross-examination of the witness at trial; (2) the witness's statement must clearly be that of the witness, rather than the interrogator, and be free from coercion; and (3) some corroborative evidence must be presented." *Commonwealth* v. *Sineiro*, 432 Mass. 735, 741 (2000). See Mass.G.Evid. § 801(d)(1)(A) (2012).

Portions of the maternal grandmother's testimony at trial are clearly inconsistent with the testimony she gave to the grand jury. Furthermore, she was thoroughly cross-examined as to her grand jury testimony and it was clear that her answers before the grand jury were more than mere confirmations or denials of the questions asked. Lastly, the maternal grandmother's grand jury testimony was corroborated by the medical evidence presented at trial. Therefore, the judge did not err in admitting, for their probative value, those portions of the maternal grandmother's grand jury testimony that were inconsistent with her trial testimony.

The mother further claims that the judge erred in admitting the entire transcript of the grandmother's statements to the grand jury in evidence at trial since portions of her testimony were consistent with her trial testimony. Assuming, without deciding, that the judge did err in admitting the entirety of the maternal grandmother's grand jury testimony, the error was harmless because the testimony was merely cumulative of properly admitted evidence and therefore likely to have very slight effect, if any, on the fact finder. See *Commonwealth* v. *Johnson*, 49 Mass. App. Ct. 273, 279 (2000).

The mother later moved, unsuccessfully, to recall the maternal grandmother to the witness stand to have her testify that she had lied to the grand jury. She now argues that the judge erred in denying her motion to recall the witness. We review a trial judge's decision whether to allow the recall of a witness for abuse of discretion. See *Guardianship of Brandon*, 424 Mass. 482, 494 (1997). "In order to find an abuse of discretion, 'it is necessary to decide that no conscientious judge, acting intelligently, could honestly have taken the view expressed by him.' " *Commonwealth* v. *Jaime*, 433 Mass. 575, 579 (2001), quoting from *Commonwealth* v. *Medeiros*, 395 Mass. 336, 351 (1985). Here, the mother's attorney previously had ample opportunity

to question the maternal grandmother about her grand jury testimony given that, during her testimony, she recanted large portions of her grand jury testimony. Consequently, the mother has failed to meet this heavy burden.

*Sufficiency of the evidence.* The mother contends there was insufficient evidence of any parental shortcoming such as substance abuse, mental disease, domestic violence, or physical abuse to warrant terminating her parental rights. In addition, she argues that the evidence was unclear whether the child's injuries were brought about by abuse or by genetics, including metabolic bone disease. She relies principally on *Adoption of Abby*, 62 Mass. App. Ct. 816, 825-826, 828 (2005) (finding of unfitness reversed where mother had no reason to know that father, who injured child, presented threat of physical abuse), and *Adoption of Zoltan*, 71 Mass. App. Ct. 185, 189-190 (2008) (without more, mother's ignorance of cause of injury does not amount to grievous shortcoming that must underlie finding of parental unfitness).

In reviewing a trial judge's determination that a parent is unfit, "our task is not to decide whether we, presented with the same facts, would make the same decision, but to determine whether the trial judge abused his discretion or committed a clear error of law." *Adoption of Hugo*, 428 Mass. 219, 225 (1998), cert. denied sub nom. *Hugo P. v. George P.*, 526 U.S. 1034 (1999). A decree dispensing with the need for parental consent to adoption will be sustained if it is supported by clear and convincing proof that the parent is currently unfit to further the welfare and best interest of the child. *Adoption of Quentin*, 424 Mass. 882, 886 (1997). "Clear and convincing proof involves a degree of belief greater than the usually imposed burden of proof by a preponderance of the evidence, but less than the burden of proof beyond a reasonable doubt imposed in criminal cases." *Custody of Eleanor*, 414 Mass. 795, 800 (1993), quoting from *Stone v. Essex County Newspapers, Inc.*, 367 Mass. 849, 871 (1975). The department has met that burden.

Here, the medical evidence of Cecily's treating physicians, credited by the judge, ruled out accidental means and concluded that abuse caused the multiple injuries to her. The judge's findings, supported in the record, were that Cecily was injured after

being violently shaken during a time when the father had exclusive caretaking responsibility for her. Moreover, the judge determined that the mother saw the father shake the child on at least two occasions prior to her hospitalization, yet failed to protect her. Unlike the facts in *Adoption of Abby*, 62 Mass. App. Ct. at 816, relied on by the mother, here the facts clearly support a finding that the mother left the child in the care of someone known to be at risk to harm the child. Moreover, the judge found that, faced with the overwhelming evidence that the father caused the horrific injuries to the child, the mother failed to acknowledge the evidence and failed to separate from Cecily's abuser.[5] Such a finding has significant weight in determining unfitness.

Accordingly, we conclude that the evidence was sufficient to find the mother unfit to parent Cecily. See *Adoption of Paula*, 420 Mass. 716, 729 (1995) (judge properly considered parent's refusal to acknowledge abuse of child in determining fitness); *Adoption of Larry*, 434 Mass. 456, 471-472 (2001); *Adoption of Lorna*, 46 Mass. App. Ct. 134, 141 (1999) (parent's inability to "recognize abuse and confront it preventatively" was solid evidence of parental unfitness).

*Subsidiary finding.* The mother also argues that there is no support in the record for the judge's finding that she was present while father was shaking Cecily. We review such a claim to determine whether the judge's finding is clearly erroneous. *Adoption of Hugo*, 428 Mass. at 224. "A finding is clearly erroneous when there is no evidence to support it, or when, 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Custody of Eleanor*, 414 Mass. at 799, quoting from *Building Inspector of Lancaster* v. *Sanderson*, 372 Mass. 157, 160 (1977).

Clearly, statements made by the maternal grandmother to the grand jury provide an adequate basis for the judge's finding that the mother witnessed the father shake Cecily. Therefore, the mother's argument amounts to no more than a dissatisfaction

---

[5] In *Adoption of Abby*, 62 Mass. App. Ct. at 820, once the mother discovered the child's injuries, she "had no contact with the father and wanted nothing to do with him."

with the judge's weighing of the evidence and his credibility determinations. See *Adoption of Hugo, supra* at 229 (trial judge is in best position to evaluate evidence, especially evidence which may be contradictory, thus judge's assessment of weight of evidence and credibility of witnesses is entitled to deference).

*Adverse inference drawn by the judge.* We find no merit to the mother's argument that the judge erred in drawing a negative inference against her for not testifying at trial to explain Cecily's injuries. As we have said in the past, "the privilege against self-incrimination applicable in criminal proceedings, which prevents the drawing of a negative inference from a defendant's failure to testify, is not applicable in a child custody case." *Care & Protection of Quinn*, 54 Mass. App. Ct. 117, 121 (2002), quoting from *Custody of Two Minors*, 396 Mass. 610, 617 (1986). While the mother acknowledges that the judge was free to draw such an inference,[6] she contends that doing so in this case was inappropriate given that, at the time of trial, criminal charges were pending against her.

The crux of the mother's argument is that, under the circumstances of the pending criminal charges against her, the judge gave the negative inference undue weight in the determination of her parental fitness. We disagree. It is clear from the judge's findings that while he drew a negative inference against the mother, the inference was merely one of several factors considered by the judge. The negative inference was considered by the judge in conjunction with his findings that the mother witnessed the father's abuse of Cecily and did nothing to protect her, the mother's failure to acknowledge the cause of serious injuries, and the mother's failure to separate from the father. That combination of factors led to the judge's decision to order the termination of the mother's parental rights.

*Posttermination visitation.* We are also not persuaded by the mother's argument that the judge erred in failing to order posttermination visitation between the mother and Cecily. The deci-

---

[6]See *Custody of Two Minors, supra* at 616 (parent's failure to testify may properly be considered as one evidentiary factor, along with other relevant factors, bearing on issue of unfitness); *Adoption of Nadia*, 42 Mass. App. Ct. 304, 307-308 (1997) (in child custody case, judge properly drew negative inference from parent's refusal to testify where department presented case adverse to parent's interests).

sion whether to grant posttermination visitation is within the judge's sound discretion. *Adoption of John,* 53 Mass. App. Ct. 431, 439 (2001). "The judge's discretion is not, however, unfettered, but must be 'grounded in the over-all best interests of the child, based on emotional bonding and other circumstances of the actual personal relationship of the child and the biological parent, not in the rights of the biological parent nor the legal consequences of their natural relation.' " *Adoption of Terrence,* 57 Mass. App. Ct. 832, 839 (2003), quoting from *Adoption of Vito,* 431 Mass. 550, 562 (2000). An order for posttermination visitation is unwarranted without adequate findings by the judge that a significant bond exists between the biological parent and the child and that continued contact would be in the child's best interests. *Adoption of John, supra.*

Here, the judge explicitly found that no bond existed between the mother and Cecily. Of particular significance is the judge's finding that, with the exception of two months of her life, Cecily had very little contact with the mother. Moreover, though mother had monthly visitation with Cecily, the judge found there was no significant attachment between them. Accordingly, we find no error in the judge's order denying posttermination visitation.

*Decree affirmed.*