NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-936

ADOPTION OF VIGGO (and a companion case[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The mother, the father, and Viggo, the older of the parents' two children, appeal from the decrees of the Juvenile Court, which terminated both parents' rights with respect to their two children, committed the children to the custody of the Department of Children and Families (department), and approved the department's adoption plan.[2] After review of the record and consideration of the parties' arguments, we affirm.

Background. The department assumed custody of the children just after the younger child was born exposed to multiple substances (heroin, fentanyl, and cocaine) in December 2018. The children spent more than a year in foster care before being returned to the mother and the father. During that year, the younger child experienced numerous medical issues, including

---

[1] Adoption of Alicia. The children's names are pseudonyms.
[2] Alicia, the younger child, advocates for affirmance of the decrees.

tightness and tremors in her arms and legs, gastrointestinal problems, sensory issues, repeated bronchitis, breathing problems, and chronic ear infections resulting from a compromised immune system.  The older child, five years old at the time of removal, shifted from foster home to foster home due to behavioral issues, which included obsession with violent video games, swearing, inappropriate conversations with younger children, and food hoarding.  He also had significant tooth decay requiring extensive dental work under anesthesia.

   After the parents had engaged in services for some time, the department returned the children to the home of the mother and the father in January 2020.  In March 2020, the department ceased in-person home visits due to the COVID-19 pandemic.  In May 2020, a department social worker observed the younger child (for the first time after her return to the mother and the father) and noted a significant decline in her appearance, urging the parents to take the child to her pediatrician.  The following month, June 2020, the younger child's pediatrician recommended that the child be immediately transported to Hasbro Children's Hospital.  At Hasbro, it was discovered that the younger child had significant weight loss, her skin appeared translucent with bruises and lacerations all over her body, her hair was brittle and balding, and she had hematomas on both ears and bone fractures in her arm and leg.

Doctors at Hasbro found the younger child's injuries to be inconsistent with accident. In particular, the hematomas on the ears, one pediatrician opined, would have resulted from blunt force trauma inflicted to the head. The pediatrician further opined that the fractures to the arm and leg would have been painful, causing the child to cry out, and that the weight loss and deterioration of skin and hair were the result of severe malnutrition. The parents indicated that the younger child's weight loss was due to the fact that she was not adjusting to solid food well. Both parents suggested that the older child, who was six years old at the time, could have inflicted the injuries on the younger child. The parents had no explanation for why they did not seek medical attention earlier except that they did not like the pediatrician. The trial judge credited the medical diagnoses and opinions regarding the younger child's injuries.

Thereafter, the younger child was placed back into her previous foster home, and the older child (after a number of interim arrangements) was also placed into a foster home. Both children improved significantly after being removed from the mother and the father. The following month, in July 2020, the mother and the father were both criminally charged with child endangerment.

Discussion. 1. Termination of parental rights. The mother, the father, and the older child each contend that the judge erred in terminating parental rights. Before terminating parental rights, a judge must first find by clear and convincing evidence that the parent is currently unfit to raise the child. See Adoption of Nancy, 443 Mass. 512, 515 (2005); Adoption of Posy, 94 Mass. App. Ct. 748, 750-751 (2019). Unfitness is determined "by taking into consideration a parent's character, temperament, conduct, and capacity to provide for the child in the same context with the child's particular needs, affections, and age." Adoption of Mary, 414 Mass. 705, 711 (1993). See Adoption of Carlos, 413 Mass. 339, 348 (1992). In order to make the subsequent determination about termination, the judge must also find by clear and convincing evidence that "the child's best interests will be served by terminating the legal relation between parent and child." Adoption of Ilona, 459 Mass. 53, 59 (2011).

Here, the judge's conclusion that the department had sustained its burden of proving by clear and convincing evidence that both parents were and would remain unfit to raise both children was amply supported in the record. See Custody of Eleanor, 414 Mass. 795, 802 (1993) (factual findings must be supported by record evidence and will not be overturned unless clearly erroneous). The judge's careful and thorough decision

4

derived directly from the testimony and documentary evidence before the court, which the judge was within her discretion to credit. See Adoption of Nancy, 443 Mass. at 515, citing Adoption of Quentin, 424 Mass. 882, 886 (1997) (it is judge's prerogative to evaluate witness credibility and to weigh evidence).

The evidence showed that the younger child was healthy when placed with the parents, but deteriorated precipitously while in her parents' care. In addition to malnutrition so severe that it affected brain development, there was evidence that the younger child sustained multiple serious injuries that were inconsistent with accident. Further, the older child disclosed physical abuse by the mother and by the father as well as physical abuse against the mother by the father. The parents were offered services to remedy their parental shortcomings, but were largely noncompliant. By the time of trial, the parents were facing criminal charges alleging intentional abuse of the children. At no time did the parents take responsibility or show any insight into how their own behavior put the children at risk.

a. Expert testimony concerning younger child. The mother contends that the judge's conclusions about unfitness were largely drawn from the testimony of a witness who was an expert in child abuse pediatrics, and that this was error because the

5

expert relied on inaccurate information about the younger child's weight, wrongly dismissed the mother's explanation for changing the younger child's diet, and opined, without support, that the older child could not have caused the younger child's injuries. The father similarly argues that the judge erred in holding the parents responsible for the younger child's physical condition where the evidence suggested that her weight loss was not readily perceptible and that the older child may have inflicted the other injuries without the parents' knowledge.

Although there were discrepancies in the medical records regarding the younger child's weight loss, the records overall support a conclusion that she suffered significant weight loss and associated malnutrition. And to the extent that there may have been alternative causes for the younger child's weight loss and injuries, these alternatives were explored at trial. As to any perceived flaws in the expert witness opinions, the parties were free to cross-examine the witness on those issues and point out the deficiencies to the judge for her consideration. See Sacco v. Roupenian, 409 Mass. 25, 30 (1990) (party free to attack inconsistencies or omissions in factual foundation, as well as flaws in analytical process through cross-examination to affect weight of evidence). Ultimately, it was for the judge to decide the weight and credibility of the evidence presented. See Adoption of Larry, 434 Mass. 456, 462 (2001). As the

6

judge's factual findings regarding the unfitness of both parents were solidly grounded in the evidence, we do not disturb them. See Adoption of Helen, 429 Mass. 856, 859 (1999).

b.  Independent evidence of abuse and neglect of older child.  The parents and the older child also argue that the judge erred in terminating parental rights as to the older child based solely on concerns regarding the neglect and abuse of the younger child.  See Petition of Catholic Charitable Bur. of the Archdiocese of Boston, Inc., to Dispense with Consent to Adoption, 395 Mass. 180, 185 n.6 (1985) (parent may be fit to raise one child but unfit to raise another).  Yet, there were concerns of neglect and abuse of the older child.  He exhibited significant dental, emotional, and behavioral issues when removed from his parents' care.  The older child's own reporting added to this evidence; he reported being unable to wake up his mother and having to make his own food.  He reported his parents being "mean" to him and physical abuse, including his mother suffocating him and his father throwing him and hitting him. There was ample evidence of abuse and neglect, specific to the older child.

2. Adverse inference against father.  The father contends that the judge erred in drawing a negative inference from the fact that he was present at trial but did not testify.  He contends that such an inference can only be drawn if a party

refuses to testify, but he never refused as he was not called to be a witness.  To the contrary, in a termination of parental rights proceeding, which is civil in nature, a negative inference may be drawn when a party fails to testify under circumstances where "a case adverse to the interests of the party affected is presented so that failure of a party to testify would be a fair subject of comment."  Custody of Two Minors, 396 Mass. 610, 616 (1986).  Here, the department presented such a case adverse to the interests of the father.  The fact that the father had a privilege against self-incrimination in the pending criminal proceedings he faced, is of no consequence as the privilege has no application in a termination proceeding.  Cf. id. at 617 (holding privilege against self-incrimination is not applicable in child custody case).  See Adoption of Cecily, 83 Mass. App. Ct. 719, 727 (2013) (in case terminating mother's parental rights, negative inference drawn against mother by trial judge appropriate where mother faced criminal charges arising out of abuse and neglect of child).  There was no error.

3.  Rejection of maternal grandmother as adoption resource for older child.  The parents challenge the judge's decision to place the older child in the department's custody, rather than with his maternal grandmother.  The judge recognized the significance of the older child's relationship with the maternal

8

grandmother, but determined that it was not in the best interest of the older child to be placed with her because she lacked insight regarding the reasons that the children were placed into the department's care. Her minimization of the trauma, neglect, and abuse the children endured gave the judge concern that the maternal grandmother would not be able to respect boundaries placed on the parents' contact with the children. We cannot say that the judge's rejection of the parents' proposed adoption plan in favor of the department's plan was an abuse of discretion. See Adoption of Jacob, 99 Mass. App. Ct. 258, 272-273 (2021).

4. Posttermination visitation. Lastly, the mother, the father, and the older child challenge the judge's rulings concerning posttermination contact. The judge found that ordering posttermination visitation was not in the children's best interest, but rather concluded that the children's respective caretakers should make all future visitation decisions. Similarly, the judge declined to issue a specific order regarding sibling visitation, concluding that while the siblings enjoyed positive interactions during their visits, the children's adoptive parents and custodians would be in the best position to gauge the extent to which visitation was in their best interests posttermination.

Once a parent is established as unfit, the decision whether to grant posttermination visits is within the judge's discretion. See Adoption of John, 53 Mass. App. Ct. 431, 439 (2001). The decision should be based on the best interest of the child. See Adoption of Ilona, 459 Mass. at 63. Notwithstanding the father's argument as to his positive relationship and bond with the older child, the judge made no finding of such a bond. See id. at 63-64 (in determining best interests, judge should consider, among other factors, whether there is significant existing bond between child and biological parent). Particularly given the no contact order in place issued by a judge in the criminal case, there was no abuse of discretion in the judge's decision not to order visitation between the father and the older child.

Although the judge did order posttermination visitation between the mother and the older child, the mother and the older child argue that the judge erred in limiting the contact, in giving the department discretion to further reduce the visitation, and in declining to order post-adoption visitation. However, the purpose of posttermination and postadoption visitation is not to strengthen the bond between the biological parents and the child but rather to ease the child's transition to another home. See Adoption of Vito, 431 Mass. 550, 564-565 (2000). "[A] judge must balance the benefit to the child . . .

10

with the intrusion that an order imposes on the rights of the adoptive parents." Adoption of Ilona, 459 Mass. at 64. The judge determined that the older child was likely to have changing needs, given his trauma history and treatment, such that it may be necessary to reduce visits if deemed advisable by the child's therapist. Similarly, those same anticipated changing needs made it inadvisable to order postadoption visitation. Under the circumstances, we cannot say it was an abuse of discretion to give the department discretion to reduce visitation under set circumstances and to leave postadoption contact to the discretion of the adoptive family. See L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014) (abuse of discretion is when decision falls outside of range of reasonable alternatives).

The older child argues that the judge erred in declining to issue a formal order of sibling visitation with the younger child. General Law c. 119, § 26B (b) (§ 26B [b]), requires the court, as well as the department, to ensure that a child placed in foster care have access to visitation with siblings, to the extent reasonable and practical and based upon the best interests of the child. In this case, as the judge found, the older child did have visitation with his sibling consistently throughout the proceeding. The judge further found that the department would continue to maintain the contact as long as it

11

was clinically appropriate.  There is nothing in the record to suggest otherwise.  Under the circumstances, the judge was not required to make a specific order regarding sibling visitation.  See Adoption of Garret, 92 Mass. App. Ct. 664, 681 (2018) (where department is permitted to manage sibling visitation pursuant to § 26B [b], no error in judge's failure to make visitation orders).[3]

Decrees affirmed.

By the Court (Rubin, Singh & Hershfang, JJ.[4]),

Assistant Clerk

Entered: January 5, 2024.

---

[3] Any arguments raised by the parents and the older child but not mentioned in this decision "have not been overlooked.  We find nothing in them that requires discussion."  Commonwealth v. Sosa, 493 Mass. 104, 124 n.12 (2023), quoting Commonwealth v. Domanski, 332 Mass. 66, 78 (1954).

[4] The panelists are listed in order of seniority.