NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-1294

ADOPTION OF LURLEEN.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

After a trial in the Juvenile Court, a judge terminated the father's parental rights to his child, Lurleen.  The record on appeal is inadequate to allow us to evaluate the father's claim that the judge failed to inquire into the child's heritage, as required under the Indian Child Welfare Act, 25 U.S.C. §§ 1901 et seq. (ICWA).  Because (1) the judge's decision was supported by clear and convincing evidence that the father was unfit, and that his unfitness was likely to continue indefinitely; (2) there is no merit to the father's challenges to the way the judge conducted the trial; (3) we discern no abuse of discretion in the judge's decision not to order visitation between the child and her father or siblings; and (4) there was no error in

_____

[1] A pseudonym.

the judge's failure to consider a kinship placement in the absence of any relatives identified as potential adoption resources, we affirm.[2]

Discussion.  1.  ICWA.  Under Massachusetts law,

"[a] child subject to adoption or parental termination proceedings may qualify as an 'Indian child' under 25 U.S.C. § 1903(4) by being 'a member of an Indian tribe,' § 1903(4)(a), or being both 'eligible for membership in an Indian tribe and . . . the biological child of a member of an Indian tribe,' § 1903(4)(b). . . .  '[W]here the court knows or has reason to know that an Indian child is involved, the party seeking the foster placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe . . . of the pending proceedings and their right of intervention.'  25 U.S.C. § 1912(a).

"The judge must affirmatively inquire whether a child is an Indian child.  See 81 Fed. Reg. 38,778, 38,805.  The inquiry should be made 'at the commencement of the proceeding and all responses should be on the record.'  25 C.F.R. § 23.107(a)."

Adoption of Ursa, 103 Mass. App. Ct. 558, 564-565 (2023).

In this case, the trial transcript does not reflect whether the trial judge "inquire[d] whether [the] child is an Indian child," and the docket is silent on the question whether such an inquiry was made "at the commencement of the [care and protection] proceeding," or at any other time during the life of the case (citations omitted).  Adoption of Ursa, 103 Mass. App. Ct. at 565.  Citing to Adoption of Ursa, the father contends

---

[2] The mother did not appeal the termination of her parental rights.

2

that "the absence of docket entries by the [trial] court indicating compliance with 25 C.F.R. § 23.107(a) . . . does not confirm [that] the trial judge" made that inquiry, and, to that extent, we agree. See Adoption of Ursa, supra (judge's determination of issue on docket is generally conclusive). We do not agree, however, that the inverse conclusion follows -- that the absence of a docket entry showing that inquiry was made affirmatively establishes that it was not made.

The mother and father were each present in court on several dates preceding the trial.[3] We do not have transcripts of any of the pretrial hearings, and so have no way of ascertaining whether the ICWA inquiry was made at an earlier date and, if so, whether there was any change in circumstances that would have required the trial judge to make a renewed inquiry. See Adoption of Ursa, 103 Mass. App. Ct. at 565 (where ICWA inquiry was made shortly after Department of Children and Families [department] filed petition, and there was no "additional 'reason to know' that the [subject children] might be Indian children, further inquiry was unnecessary"). See also Adoption of Breck, 105 Mass. App. 652, 665-666 (2025) (based on

---

[3] The docket reflects that at a hearing on October 26, 2022, the father was added to the petition and counsel was appointed to represent him. Additional pretrial hearings were held on three subsequent dates.

3

appropriate ICWA inquiry at outset of case, judge found that ICWA did not apply). As the appealing party, the father had the obligation to produce an appendix containing all relevant portions of the record. See Roby v. Superintendent, Mass. Correctional Inst., Concord, 94 Mass. App. Ct. 410, 412 (2018) ("it is the appellant's responsibility to ensure that the record is adequate for appellate review" [citation omitted]); Mass. R. A. P. 18 (a), as appearing in 481 Mass. 1637 (2019). "Like any child who is the subject of a care and protection proceeding, [Lurleen] . . . [is] entitled to permanency." Adoption of Norbert, 83 Mass. App. Ct. 542, 547 n.8 (2013). Where the father did not produce a record adequately supporting his ICWA challenge, we decline to disturb the decree.[4]

2. Father's unfitness. "To terminate parental rights to a child, [a] judge must find, by clear and convincing evidence, that the parent is unfit and that the child's 'best interests will be served by terminating the legal relation between parent and child.'" Adoption of Luc, 484 Mass. 139, 144 (2020), quoting Adoption of Ilona, 459 Mass. 53, 59 (2011). Clear and convincing evidence means that "[t]he requisite proof must be strong and positive; it must be 'full, clear and decisive.'"

---

[4] Of significance here, the father has not claimed Native American heritage at any point, and the extensive record lacks any information showing that Lurleen, the parents, or any other family member is a member of, or affiliated with, any tribe.

4

Adoption of Chad, 94 Mass. App. Ct. 828, 838 (2019), quoting Adoption of Iris, 43 Mass. App. Ct. 95, 105 (1997). "We review the judge's [subsidiary] findings with substantial deference, recognizing [the judge's] discretion to evaluate a witness's credibility and to weigh the evidence," Adoption of Nancy, 443 Mass. 512, 515 (2005), "and reverse [the judge's termination decision] only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Ilona, supra.

In this case, over the span of some twenty-five single-spaced pages, the judge made "specific and detailed findings in support of [the] conclusion that termination [was] appropriate," and carefully applied those findings in fifteen pages setting forth corresponding conclusions of law. Adoption of Nancy, 443 Mass. at 514-515. The father does not challenge any of those findings as clearly erroneous.

In assessing the father's parental fitness, the judge properly considered an array of factors, including evidence of the father's ongoing substance misuse. At trial, although the parents testified to being sober, the judge noted on the record that both the mother and the father appeared intoxicated; the judge specifically noted that the father was "nodding off" while in the courtroom gallery, the parents were "tap[ping] each other to keep each other awake," and the father was unable to keep

5

hold of his cell phone because he kept falling asleep.[5]  The judge also noted that the father was not attentive to his hygiene, despite the judge's speaking to both parents about their presentation, and that the parents sometimes appeared "jittery and unable to sit still."  These indicators of substance misuse and its effect on the father's ability to remain awake and alert were relevant to the judge's determination of the father's unfitness.  See G. L. c. 210, § 3 (c) (xii); Adoption of Anton, 72 Mass. App. Ct. 667, 676 (2008); Adoption of Zoltan, 71 Mass. App. Ct. 185, 190 (2008).

These were not the judge's only findings regarding the effect of the parents' substance misuse on their parenting ability.  For example, the judge found that, during a home visit approximately eight months before trial began, a visiting social worker found white powder on a scale in the father's house; the judge did not credit the father's testimony that the powder was plaster dust, and instead considered it evidence that the father did not have "safe, stable, and appropriate" housing for the child.  See Adoption of Quentin, 424 Mass. 882, 887 (1997) (evidence that parents maintained unsafe home was relevant to

_____

[5] Based on her observations, the judge positioned court officers equipped with Narcan near where the parents sat, and placed an empty container near the father out of concern that he might be sick.

6

unfitness determination); <u>Adoption of Franklin</u>, 99 Mass. App.
Ct. 787, 799 (2021) (parent's drug-related activity in
children's presence was relevant to finding of parental
unfitness).  Similarly, the father's claims of sobriety at the
time of trial were undermined by the fact that, midtrial, he was
arrested and charged with a series of drug-related offenses
after a traffic stop.[6]  See <u>Care & Protection of Frank</u>, 409 Mass.
492, 494-495 (1991) (parent's criminal history may be relevant
to determination of unfitness).

Additionally, although the father's action plan required
him to engage in substance use counseling and programming, the
judge found that the father did not comply with that
requirement.  See <u>Adoption of Luc</u>, 484 Mass. at 147 ("parent's
willingness to engage in treatment [for substance use disorder]
is an important consideration in an unfitness determination").
Moreover, after the home visit described above in which
suspected drugs were found in the father's basement, the father

_____

[6] Although the father was released from custody while the
trial was underway, he did not immediately return to court for
the trial as instructed; the judge drew a negative inference
from the father's failure to appear.  Although the father
appeared later that day, he did not appear for trial at all on
December 15, 2023, or January 25, 2024, prompting the judge to
draw negative inferences.  See <u>Adoption of Talik</u>, 92 Mass. App.
Ct. 367, 371-372 (2017) (parent's absence from termination of
parental rights proceeding "may suggest that the parent . . .
cannot meet the child's best interests").

stopped allowing the department to conduct home visits. The judge also found that, while the father did participate in services directed toward improving his parenting and his awareness of the effect that his domestic violence against the mother had on his fitness, he did not benefit from those services. See Adoption of Garret, 92 Mass. App. Ct. 664, 673-674 (2018) (judge justifiably concluded that parent's failure to benefit from services "rendered [parent] unfit to carry out [his] parental duties").

Finally, the judge found that, although the father loves the child, the father was inconsistent in his visits with the child as of nine months before trial. In the judge's view, the trial evidence showed that the father was unable to appreciate the child's need for stability, provide for her significant health and developmental challenges, or prioritize her needs over his own. See Adoption of Oliver, 28 Mass. App. Ct. 620, 625-626 (1990). Accordingly, there was no error in the judge's determination that the father was likely permanently unfit to parent the child. See Adoption of Luc, 484 Mass. at 144.

3. Conduct of trial. a. Judge's offers of drug screens. During the trial, the judge made a contemporaneous record of her observations of the parents' apparent insobriety, including (as we have described) the father's repeated "nodding off" as the trial was going on. See Adoption of Yvonne, 99 Mass. App. Ct.

8

574, 580 (2021) ("A parent's behavior during trial . . . [is] relevant to parental fitness").  Confronted with these observations, however, the father consistently maintained that he was sober and "just tired."  In the face of the father's challenge to her interpretation of his conduct and presentation, the judge offered the father (and the mother) opportunities to rebut her observations by taking a drug screen.[7]  The screens were not mandatory; the judge was explicit that the parents "ha[d] the right to decline if they [chose] to."  The father did not successfully complete any screens during the trial, and the trial continued without any such screens.

The judge did not deprive the father of a fundamentally fair trial by offering the parents the opportunity to take a drug screen.[8]  Even assuming that the judge overstepped by suggesting that screens were available (a conclusion we do not reach), where the judge was explicit that the "[f]ather's refusal to take a drug screen test was not taken as a factor in [her] determination to terminate his parental rights," we

---

[7] The judge made these offers on the first, second, and fourth days of trial.

[8] The father's claim that the judge's actions amounted to "structural error" is misplaced.  "[The] doctrine [of structural error] does not control civil issues," although "it affords a useful analogy."  Adoption of Gabe, 84 Mass. App. Ct. 286, 293 (2013).

discern no prejudice resulting from the judge's offers.  See Kendall v. Kendall, 426 Mass. 238, 243 n.11 (1997) (no prejudice from improper admission of evidence where "the judge specifically stated that she did not rely on [it]").

The judge's statement that her observations during the trial "[would] be factors in [her] decision" also does not change our view.  As we have noted, "A parent's behavior during trial . . . [is] relevant to parental fitness," Adoption of Yvonne, 99 Mass. App. Ct. at 580, and it was proper for the judge to consider what she saw at trial.  Likewise, the judge's references in her conclusions of law to the father's failure to verify his sobriety, and the judge's disbelief in the father's testimony that he was sober, were not improper inferences drawn from the father's failure to drug test during the trial.  Rather, these conclusions referred back to the father's failure to comply with his action plan requirements that he "become involved in a sober community" and "not abuse or use substances" and to the judge's firsthand observations of the father's presentation and conduct during the trial.  See Adoption of Yvonne, supra; Adoption of Leland, 65 Mass. App. Ct. 580, 585 (2006) (parent's failure to follow action plan may be relevant to finding of unfitness).  Accordingly, the judge did not deprive the father of a fair trial by offering the parents the

10

opportunity to drug screen.[9]  Relatedly, where the judge did not

rely on the father's failure to screen in her decision, her

offers likewise did not "create[] evidence which . . .

diminish[ed] [the department's] burdens of persuasion and

production," as the father contends.

b.  Father's condition during trial.  On appeal, the father

argues that, given the judge's observations of the father's

apparent intoxication, the judge should have inquired into

whether the father was able to assist his trial counsel, and

should have suspended the trial to allow the father to obtain

appropriate medical treatment.  Neither of these claims was

raised during the trial,[10] and, as a result, they are waived.

See Adoption of Gregory, 434 Mass. 117, 120 n.1 (2001).

4.  Visitation and placement.  The question whether to

order posttermination visitation between a child and a parent is

committed to the discretion of the trial judge.  Adoption of

Cecily, 83 Mass. App. Ct. 719, 727-728 (2013).  "A judge should

_____

[9] The record on appeal does not support the father's claim
that he was "forced . . . to choose whether to waive his
[Fourth] Amendment [to the United States Constitution]
protections in order to verify his sobriety . . . [and] regain
custody of his daughter."  At no point did the judge state that
drug screens were the only way in which the father would be
allowed to verify his sobriety.

[10] Indeed, as we have noted, the father maintained that he
was sober during the trial.

11

issue an order of visitation only if such an order, on balance, is necessary to protect the child's best interest[s]." Adoption of Ilona, 459 Mass. at 65. The same standard applies to a judge's decision about whether to order postadoption visitation. See Adoption of Xarissa, 99 Mass. App. Ct. 610, 623-624 (2021).

Here, the judge found that posttermination and postadoption visitation between the child and the father was not in the child's best interests, and her decision was well supported. By the time of trial, the two year old child had been in the custody of the department since her birth, and she was bonded to her foster family, which was interested in adopting her. As we have summarized above, the judge found that the father loves the child, but that he had failed to visit the child consistently when given the opportunity, he was unable to ameliorate his parental shortcomings, he did not appreciate the impact of his substance misuse and other challenges on his parenting ability, and he was not up to the task of addressing the child's special needs. Against this backdrop, we cannot say that the judge abused her discretion in declining to order posttermination or postadoption visitation. See Adoption of Cecily, 83 Mass. App. Ct. at 727-728.

Because there was no evidence at trial that the child had a family member willing to be a preadoptive or adoptive resource, we also discern no error in the judge's approval of a nonkinship

12

placement for the child. To the extent the father argues that the judge abused her discretion in failing to order visits between the child and the parents' other children,[11] we note that the father did not request such an order at trial, nor did he present any evidence about the appropriateness of such visits. In these circumstances, and where the child and her half-siblings were not separated by State intervention, we discern no error in the judge's decision not to order sibling visitation. See G. L. c. 119, § 26B (b).

> Decree affirmed.
>
> By the Court (Ditkoff, Hand & Grant, JJ.[12]),
>
> *Paul Little*
>
> Clerk

Entered: August 12, 2025.

---

[11] The parents do not share any children other than Lurleen. The mother has two older children with a different father; those children are in the custody of their father. The father has an older child with a different mother; his parental rights to that child were terminated in 2015. At the time of trial, Lurleen had never met her half-siblings.

[12] The panelists are listed in order of seniority.